UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| SHAWN R. SORENSEN,<br><br>                    Plaintiff,<br><br>        vs.<br><br>CAROLYN W. COLVIN,<br>COMMISSIONER OF SOCIAL<br>SECURITY;<br><br>                    Defendant. | 4:14-CV-04065-LLP<br><br>REPORT AND RECOMMENDATION |

## <u>INTRODUCTION</u>

Plaintiff, Shawn R. Sorensen, seeks judicial review of the Commissioner's

final decision denying him payment of benefits under Title II and Title XVI of

the Social Security Act.[1]  Mr. Sorensen has filed a Complaint and asks the

court to reverse the Commissioner's final decision denying his disability

---

[1]Supplemental Security Income (SSI) benefits are sometimes called "Title XVI" benefits, and Social Security Disability or Disability Insurance Benefits (SSD/DIB) are sometimes called "Title II benefits." Eligibility for both forms of benefits depends upon whether the claimant is disabled.   Disability is defined the same under both Titles.  The difference –greatly simplified--is a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to earning history), and the amount of benefits are likewise calculated using the claimant's earning history.  There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.  There are corresponding and usually identical regulations for each type of benefit.  <u>See</u> <u>e.g.</u> 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five step procedure under Title II and Title XVI). Mr. Sorensen filed his application for both types of benefits. AR 153, 157.  His coverage status for SSD benefits expired on June 30, 2013. AR 15.  In other words, in order to be entitled to Title II benefits, Mr. Sorensen must prove he was disabled on or before that date.

benefits and to enter an order awarding benefits.   Alternatively, Mr. Sorensen asks the court to remand the matter to the Social Security Administration for further development with instructions to (1) properly evaluate the opinions of Mr. Sorensen's medical providers; (2) reassess his residual functional capacity ("RFC"); (3) reassess his testimony and credibility; (4) further develop the record with additional consultative exams and vocational expert  ("VE") testimony as necessary; (5) reassess the availability of jobs; and (6) issue a new decision based on substantial evidence of the record as a whole and proper legal standards.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the District Court pursuant to 42 U.S.C. § 405(g).  Judge Piersol referred this matter to the magistrate judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and Judge Schreier's Standing Order dated October 16, 2014.

## STIPULATED FACTS[2]

**A.      Administrative Proceedings.**

This action arises from Mr. Sorensen's application for SSDI and SSI benefits protectively filed on February 4, 2011, alleging disability since

---

[2]The stipulated facts were agreed upon and submitted by the parties.  See Docket. 13.  The paragraph numbers have been deleted and a few headings have been altered by the court. The parties referred to the plaintiff by his first name but the court refers to him by his surname.  A few grammatical and/or stylistic changes have been made.  Otherwise, the stipulated facts are recited in this opinion from the parties' submission.

December 20, 2010 due to problems with his right hand, back, shoulder, and arthritis. AR 153, 157, 179, 184.[3]

Mr. Sorensen's claims were denied both initially and upon reconsideration. AR 91, 99, 101.   Sorensen then requested an administrative hearing. AR 104.

Mr. Sorensen's administrative law judge hearing was held on September 7, 2012, by the Honorable Denzel R. Busick, ("ALJ"). AR 31. Mr. Sorensen was represented by different counsel during the hearing. Id.  An unfavorable decision was issued on September 26, 2012. AR l0.

The ALJ found Mr. Sorensen met the insured status for benefits through June 30, 2013. AR 15.

The ALJ found Mr. Sorensen had not engaged in substantial gainful activity since the alleged onset date December 20, 2010. AR 15.

The ALJ found multiple severe impairments including the following: status post left shoulder arthroscopy, coracoclavicular joint reconstruction with acromioclavicular joint repair, and subacromial bursectomy without acromioplasty (November 2006); status post fracture of the right index metacarpal with deformity; status post open reduction and internal fixation surgery of the right wrist (August 1990), with loss of scapholunate ligament and radiocarpal arthrosis; status post left ankle fracture; degenerative disc disease of the lumbar spine; and degenerative disc disease of the cervical spine.

_____

[3] Citations to the administrative record will be cited using "AR" followed by the relevant page number(s).

AR 15. The ALJ also found none of Mr. Sorensen's impairments met or medically equaled a Listing. AR 17.

The ALJ determined Mr. Sorensen had a RFC to perform less than the full range of light work. AR 17. More specifically, the ALJ found Mr. Sorensen could lift and carry ____ pounds occasionally[4] and less than 10 pounds frequently, could sit 6 hours as well as stand and walk 6 hours out of an 8-hour workday with normal breaks, and was limited to occasional overhead reaching with the left upper extremity, and occasional handling and fingering with the dominant right hand. Id. Posturally, Mr. Sorensen was further limited to frequent climbing of stairs and ramps, balancing, crouching, kneeling, and stooping. Id. The ALJ stated Mr. Sorensen could frequently crawl, but then stated he should avoid crawling due to his left arm problems. Id. Sorensen was also to avoid working on ladders, ropes, and scaffolds, and to avoid concentrated exposure to hazards such as unprotected heights, fast and dangerous machinery, high vibrations, and extreme cold. Id.

The ALJ found Mr. Sorensen's medically determinable impairments could cause the symptoms alleged by him, but that his statements concerning the intensity, persistence, and limiting effects of those symptoms was not credible "to the extent they are inconsistent with the above residual functional capacity assessment." AR 18.

---

[4] The ALJ did not specify how many pounds Mr. Sorensen could carry occasionally in his written decision, but in his oral description to the VE, he indicated Mr. Sorensen could "pick up 20 pounds on occasion." See AR 17, 48.

Based on the RFC determined by the ALJ, the ALJ found Mr. Sorensen was not able to perform his past relevant work. AR 22.

The ALJ then found, based on testimony from a vocational expert, that other work existed in significant numbers that Mr. Sorensen could perform, and concluded he was not disabled. AR 22-23.

Mr. Sorensen timely requested review by the Appeals Council. AR 7.

The Appeals Council considered the additional evidence submitted by Mr. Sorensen, as listed in the Appeals Council Order, but denied his request for review, making the ALJ's decision the final decision of the Commissioner. AR 1-4. The additional evidence included O*NET occupational information for counter and rental clerks, as well as treatment notes from Falls Community Health Center dated April 8, 2012, through January 10, 2013. AR 4, 239, 422-29. The Appeals Council stated that it considered this additional evidence, but found that it did not provide a basis for changing the ALJ's decision. AR 2, 4. Mr. Sorensen timely filed this action.

## B. Plaintiff's Age, Education and Work Experience.

Mr. Sorensen was born in 1961, making him one month shy of 51 years old, or an individual approaching advanced age at the time of the decision. AR 153, 20 CFR § 404.1563(d).  Sorensen obtained a GED in 2001. AR 185.

The vocational expert ("VE") found Mr. Sorensen had past work as a truck washer, concrete laborer, pipe insulator, maintenance worker, and floor cleaner. AR 233. Sorensen reported similar descriptions in a work-history report he completed. AR 200-07. The ALJ found Mr. Sorensen could not

perform any of his past relevant work, although the decision does not list all of the jobs listed by the VE. AR 22.

Mr. Sorensen's earnings record as of August 10, 2012, shows earnings of $12,418.50 in 1998; $5,474.76 in 1999; $2,274.00 in 2000; $0 in 2001; $0 in 2002; $2,864.75 in 2003; $14,286.50 in 2004; $18,278.75 in 2005; $14,714.57 in 2006; $3,500.00 in 2007; $0 in 2008; $0 in 2009; $4,222.50 in 2010; $2,526.11 in 2011; and $0 in 2012. AR 174.

## C.    Plaintiff's Function Report

Mr. Sorensen completed a function report in March 2011 as a part of his application paperwork. AR 192-99. He indicated that in a typical day, he took his daughter to school, got his disabled son ready for the bus, and drove his wife to work. AR 192. He reported that he also took his children to therapy and doctors' appointments. AR 193.

Mr. Sorensen reported that he could walk "a few blocks" before having to rest for ten minutes, (AR197), that he had trouble gripping with his right hand, and that his shoulder and back would ache after "a couple of hours of use." AR 199. Mr. Sorensen indicated that his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and use his hands were all impacted by his impairments, but he did not indicate that his ability to talk, hear, see, remember things, complete tasks, concentrate, understand, follow instructions, or get along with others was impacted. AR 197.

Mr. Sorensen also reported his mother runs his budget otherwise he would screw it up. AR 195. He reported he no longer played sports and has no

grip with his right hand, (AR195), and also reported that he gets up two or three times a night to stretch. AR 193.

**D.    Relevant Medical Evidence.**

**1.    Orthopedic Center:**

Mr. Sorensen was seen at the McKennan Hospital ER on February 27, 1978, with a fractured index metacarpal of the right hand. AR 272. The records also reference considerable difficulty with a ring finger, noting multiple prior surgeries for a hunter prosthesis and later a graft, and that ray amputation was likely. Id.  Closed treatment of the right index metacarpal was performed. Id.

A progress note from Sorensen's March 29, 1978, follow-up visit documents that he was evaluated for his right hand and was "getting along nicely" and was "going to take it easy for a couple of weeks." AR 272. "A little angulation of his metacarpal" was noted, but it was believed that "he should do well." Id.

Previously, Mr. Sorensen  was seen on July 8, 1977, and July 15, 1977, for follow-up treatment on his ring finger. AR 271. The records do not indicate the specifics of the prior treatment, but a cast was removed, sutures were left in place, and a lack of full extension and full flexion of his fourth finger was noted. Id.  He was to continue his exercise program. Id.

Mr. Sorensen also was treated at the McKennan Hospital ER on November 29, 1977, with pain in his left wrist, which was diagnosed as a possible fracture, and a navicular cast was placed. AR 270.

**2.     Avera McKennan Hospital:**

Mr. Sorensen was seen following injury to his right wrist on August 27, 1990, and diagnosed with transscaphoid perilunate fracture/dislocation of the wrist. AR 333-34.  X-rays of the right wrist obtained on August 27, 1990, revealed a vertical fracture, widening of the scappho-Iunate joint space, and dorsal rotation/subluxation of the lunate. AR 335. Open reduction and internal fixation surgery of the right wrist was performed on August 28, 1990, which included placement of metallic pins. AR 330-31. Good position and relationship of the carpal bones was noted following the surgery. AR 330.

**3.     Sanford Sycamore Clinic:**

Treatment records from November 26, 2010, note osteoarthritis as one of Mr. Sorensen' assessed conditions. AR 242.

Mr. Sorensen was seen January 26, 2011, for lymphadenopathy and H. pylori infection. AR 251.

Mr. Sorensen was seen on October 5, 2011, seeking an orthopedic referral for his right hand. AR 292.  He had injured it years earlier and reported five surgeries and one wrist surgery since that time. Id. He reported pain and stiffness without numbness or tingling in the right hand and wrist, and deformity of the fourth right finger. Id. Swelling at the base of the thumb was also noted, along with defuse tenderness of the hand and wrist on examination. Id.  Mr. Sorensen inquired about additional surgical options, said he had tried splints and PT, and noted he was unable to take pain medications due to his drug use history. Id. Shawn was referred to the Orthopedic Institute. AR 297.

8

### 4.    Falls Community Health Center:

Mr. Sorensen was seen on August 8, 2012, complaining of increased right wrist and hand pain. AR 424. He stated he had been seen by an orthopedist and they recommended additional surgery, but he was nervous about additional surgery due to the increased pain following prior surgery, and now he had lost his Medicaid coverage and could not afford surgery. AR 424-25. Pain was noted "with all passive and active [range of motion] of [the] right wrist, hand, and digits." AR425. The examiner also noted that Sorensen had a surgical scar to the palm of his right hand along with atrophy and an inability to move his right 4th digit. Id. There was no notable erythema or edema. Id. Meloxicam was prescribed for his pain. AR 426.

Mr. Sorensen was seen again on August 20, 2012, complaining of increased right wrist pain. AR 423. The Meloxicam was causing stomach problems and did not help his pain. Id.  Examination showed mild swelling in the right wrist and some pain with palpation throughout the right hand and wrist. AR 424.  He was "able to do" range of motion. Id.  X-rays were obtained and showed likely posttraumatic or postoperative fusion of the lunate and capitate, widening of the scapholunate interval suggestive of ligament disruption, also likely chronic, and flexion deformity of the fourth DIP joint. AR 428. The Meloxicam was discontinued and Tramadol was prescribed for pain. AR 424. Tara Geis, MD, also wrote a letter in which she stated that Mr. Sorensen had been seen that day for acute wrist pain and was given a new

medication for pain relief. AR 427. The Tramadol was renewed in November 2012, and again in January 2013. AR 423.

### 5.    Orthopedic Institute:

Mr. Sorensen was seen on October 31, 2006, following an automobile accident in which he was "t-boned from the driver's side at 70-80 mph," complaining of left shoulder pain and neck pain with decreased range of motion. AR 266.  See also  AR 390-421 (hospital records from September 24, 2006 to September 26, 2006, related to injuries from the accident). Examination revealed decreased cervical range of motion, positive Spurling test, left clavicle tenting underneath the skin with limited range of motion, and reduced strength due to pain. Id. X-rays showed type V acromioclavicular joint injury with displaced clavicle. Id. X-rays of his neck obtained on October 31, 2006, revealed degenerative disc disease of the neck at C5-C6, resulting in mild bilateral bony neural foraminal stenosis. AR 265, 267.

Mr. Sorensen underwent left shoulder surgery, including AC joint reconstruction, on November 13, 2006. AR 265, see also 275-77 (surgery records).  He was released to work on December 28, 2006 with a lifting and carrying limit of five pounds with his left shoulder/arm. AR 264. On January 30, 2007, Mr. Sorensen was doing well with no complaints, no tenderness over the AC joint, near symmetric AC joints, alight asymmetry, forward elevation of 160, external rotation to 60, and 5 out of 5 on strength. AR 263. His lifting limit was raised to 15 pounds, but he continued to be restricted from any

overhead work. Id. Shawn's doctor noted that he "[would] consider letting him go back to work with full duties at the five month point." Id.

Mr. Sorensen was seen on October 28, 2011, complaining of right wrist pain, which had been progressive in nature over the past several years. AR 262. Examination of the right wrist revealed significant tenderness over the scapholunate interval with a positive Watson and shuck test, a fairly limited range of motion, and decreased grip strength compared to the opposite side. Id. X-rays revealed degenerative changes of the radiocarpal joint, a very widened scapholunate interval with a DISI deformity, and the diagnosis was scapholunate advanced collapsed wrist or SLAC wrist. Id. Orthopedist Corey Rothrock, MD, stated that due to the advanced stage of arthrosis, Sorensen was not a good candidate for reconstruction or repair. Id. Nonetheless, due to his symptoms, a fusion or salvage type procedure was indicated. Id.

Dr. Rothrock stated that due to the level of arthrosis in the wrist, Mr. Sorensen was not a good candidate to try to continue doing labor type activities, especially with any salvage type procedure, which would cause significant difficulty due to his limited range of motion. AR 262. Sorensen was given a corticosteroid injection to help calm the wrist while he sought new employment. Id.

Dr. Rothrock also wrote a letter on October 28, 2011, in which he repeated his opinion that due to advanced arthrosis of Sorensen's wrist and the need for a salvage type procedure with fusion at some point, he was not a good candidate for labor-type activity. AR 261, 268. Dr. Rothrock further encouraged

11

Mr. Sorensen "not to do any lifting or range of motion of the right wrist in the interim." Id.

### 6.    Sioux Falls Chiropractic:

Mr. Sorensen was seen for chiropractic examination and treatment due to back pain on December 13, 2010. AR 343-44. Examination revealed limited lumbar range of motion due to pain and tenderness with mild involvement of the neck. Id. X-rays showed severe degenerative joint disease, severe disc thinning, and bone spurs. AR 348. The diagnosis was lumbar subluxation complex, lumbar disc degeneration, and thoracic subluxation. AR 343-44. Chiropractor Kirk Henderson, DC, stated that Sorensen was totally incapacitated from work, but would be reevaluated on December 14, 2010. AR 347.

Mr. Sorensen received multiple treatments in December 2010 and January 2011, and the re-evaluation on 1/10/11 showed improved range of lumbar motion, and decreased muscle spasms. AR 349-61. Dr. Henderson noted that all six lumbar ranges of motion had improved, Yeoman's orthopedic test had had 100% improvement, Ely's test had 50% improvement, the patient's subjective back index had improved from 78 to 32, and his lumbosacral muscle spasms had decreased significantly. AR 361. Mr. Sorensen reported that his low back was "much better and feeling good," although he still had bilateral low back stiffness, especially in the mornings. AR 358-359. He said his shoulders, mid back, and neck were feeling good and denied headaches or any pain or numbness going down into his legs. Id.

### 7.      Brian Kidman, MD, Consultative Examination:

Mr. Sorensen was sent for a consultative examination by the state agency to Brian Kidman, MD on 4/28/11. AR 256. Sorensen's problems were listed as low back pain, neck pain, left shoulder pain, and right hand and wrist pain and weakness. AR 256-57.

Mr. Sorensen told Dr. Kidman that his typical day included stretching, getting the kids up, taking his eight-year-old to school, reading his Bible, watching westerns on television, cleaning the house, cooking supper, and loading the dishwasher. AR 258. Dr. Kidman noted that Sorensen indicated he could perform all chores and self-care activities. Id. Dr. Kidman noted that Sorensen used to play sports, but can't do that anymore, and "[h]e does try a little bit of bowling and softball apparently."   Id.

Mr. Sorensen reported his back pain started following a fall in December 2010, although he had had chronic low back pain for many years, as well as some numbness in his right leg and hip area. AR 256. He reported his back pain had been improving some following chiropractic treatment and home exercises. Id. He said he could repeatedly lift up to ten pounds, carry ten pounds, and was not able to repeatedly bend, stoop, or twist. Id. He reported he could sit two or three hours at a time, and walk for an hour, stand for three or four hours at a time, and walk up to a couple of miles before the pain bothered him.  Id.  He rated his back pain as a two out of ten. Id. Examination revealed a reduced range of motion as follows: LS-spine 90 degrees flexion and 10 degrees lateral bending bilaterally and no extension, and he had discomfort

13

with that range. AR 258. X-rays revealed degenerative disc disease from L4 to SI with anterior vertebral body lipping and near bridging between L5 and S1, and mild degenerative joint disease facets L4 to SI bilaterally. AR 259. Dr. Kidman's assessment of Sorensen's back condition was chronic low back pain with obvious evidence of degenerative disc and degenerative joint disease. Id.

Dr. Kidman stated the degenerative disc disease was moderate and the degenerative joint disease was moderate to marked in severity, particularly in the lower portion of the spine. AR 259. He stated that he had "no doubt" that Mr. Sorensen has pain emanating from these areas with the work activities he would need to do to be employable with his current level of training being mostly labor related jobs. Id.

Mr. Sorensen reported his neck pain had been bothering him for several years, that he would get shooting pain up the side of his neck if he walked more than one or two miles, and that he would get neck pain if he lifted over five pounds repetitively. AR 256. Examination revealed a full range of motion of the cervical and thoracic spine without pain. AR 258. X-rays revealed degenerative disc disease from C5-C8 with anterior vertebral body lipping and near fusion from C5-C6. AR 259.  Dr. Kidman stated Sorensen's neck had obvious objective findings of degenerative disc, degenerative arthritis, and degenerative joint disease, which he was sure would cause pain from his neck. Id. Dr. Kidman also noted that "any work that would require craning of his neck or bending of his neck repeatedly would be difficult for him I'm sure." Id.

14

Mr. Sorensen reported that his left shoulder continued to be painful and tighten up when he had been lifting things for an hour or two. AR 256-57. Examination revealed a full range of motion in the left shoulder, but with a little pain. AR 258. X-rays of the left shoulder showed narrow joint space, which Dr. Kidman thought was likely post-surgical rather than arthritic, but an MRl would be needed to discern if there was other pain causing findings which would disable him from using the shoulder. AR 259. At that point, however, Dr. Kidman believed Mr. Sorensen's  shoulder pain was "more subjective and less objective." Id.

Mr. Sorensen reported that since surgery on his right wrist for a fracture in 1994, he had had chronic pain, and with his fused ring finger, in addition to pain, he had a weak grip. AR 257. He reported at times dropping things when his thumb relaxed on its own, and he had hand and wrist pain when opening a can. Id. He said his weakened grip caused problems using hand tools. Id. Dr. Kidman noted five prior surgeries on the hand. Id. Examination revealed a normal range of motion in the forearm without pain, and a limited range of motion of the wrist as follows: 0 extension, 30 degrees flexion, 5 degrees ulnar deviation, and 5 degrees radial deviation with tenderness circumferentially around the wrist on palpation. AR 259. The right hand revealed tenderness in the palm and thenar area on palpation, and reduced strength in the right hand and right wrist, 4.5/5. Id. Full strength was noted in Sorensen's right shoulder, left upper extremity, and both lower extremities. Id. X-rays revealed fused PIP and DIP joints of the right ring finger and mild degenerative changes in the

right wrist. <u>Id.</u> Dr. Kidman concluded that Shawn's "[r]ight hand and right wrist arthritic changes with fused 'index finger" would likely contribute to pain and some weakness in the right hand with use that would be typical of labor. <u>Id.</u>

Dr. Kidman noted that "Getting on and off the 'examination table and in and out of a chair is unremarkable."  AR 259.

Dr. Kidman stated, "If the patient is able to obtain additional orthopedic attention and get additional pain medication to help him with the above conditions, then he may well be able to do a little bit more work, but I doubt even at that, that he would be able to continue with labor-related work for very much longer, even with chronic pain medication, unless corrective surgery was possible, which I'm not really sure that it would be shy of joint replacement procedures for his shoulder and wrist." AR 259-60.

### 8.    State Agency Assessments:

The state agency experts, Larry Vander Woude, M.D., and Frederick Entwistle, M.D., reviewed Mr. Sorensen's records at the initial and reconsideration level and found severe impairments of osteoarthritis and allied disorders, dysfunction in major joints, and degenerative disc disease. AR 57, 76. Dr. Vander Woude and Dr. Entwistle concluded Sorensen could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk with normal breaks for about six hours in an eight-hour workday; and sit with normal breaks for about six hours in an eight-hour workday. AR 58, 77. In addition, Sorensen could perform only frequent climbing and stooping, had

limited reaching overhead with his left arm, was limited to frequent handling and fingering with the right wrist and hand, and had limited feeling on the right. AR 58-59, 78-79. Dr. Vander Woude and Dr. Entwistle both referenced findings from Dr. Kidman's exam, but neither indicated what weight was given to Dr. Kidman's report. AR 59-60, 79.

**E.    Testimony at the ALJ Hearing**

      **1.    Mr. Sorensen's Testimony:**

Mr. Sorensen testified that he had past work insulating pipe and duct, as well as apartment maintenance work which required a variety of tasks. AR 41-42. He said he had also worked through a staffing company in a concrete job, but he slipped and hurt his back at home and was fired two days later. AR 46.

He was currently washing a couple of trucks, a couple of times a week, for a total of five or six hours per week. AR 43. Mr. Sorensen explained that he does it mostly using his left arm and they zip tie the handle so he does not have to squeeze it, because he has very limited grip with his right hand. AR 43-44. He said he could only do it for a couple of hours at a time because it hurt to reach overhead, and after raising his left arm above his head he has to bring it down after only two or three minutes. AR 44. He said his boss is a friend of his who understands his limitations and works with him. AR 45. He said it takes longer for him to clean a truck than other employees. Id.

Mr. Sorensen testified that in his last job working in a manufacturing setting he aggravated his right wrist using an impact wrench. AR 36-37. He described it as feeling like a fresh break or sprain, so he saw Dr. Rothrock who

told him it was arthritis in the wrist and there was nothing they could do for it, other than try a fusion surgery. Id.

Sorensen testified he was right-handed and had a deformed finger on his right hand. AR 37, 39. He also noted he had had "like five surgeries" on his right hand trying plastic tendons and then a tendon from his ankle. Id. He said he had always had problems with his hand, some pain, cramping, and problems with the fingers working together, but he had been able to work with the deformed finger. AR 38. He said the new problem was now more with his wrist. Id.

When asked about handling or fingering things with his hand, he said it hurts. AR 38. When asked about being able to pick things up, he explained he can do a lot of things for a little while, but with repetitious use it gets worse and worse. AR 38-39.

Sorensen testified that using both arms he could pick up and carry 25 pounds. AR 39. He started to say, "But if I do it all day ... " but was interrupted by the ALJ. Id. He said he could stand and walk a couple of hours before he needs to sit down. Id.

He fractured his left shoulder years ago in a car accident and required extensive surgery, and since that incident he has had pain when working above his head. AR 40-41.

Sorensen testified that he has neck and back problems, and if he stands in one place very long or bends too much, then he needs to stand and stretch

18

his back. AR 46. Moreover, if he sits too long his neck gets tight and kind of locks up. Id.

### 2.    Vocational Expert Testimony:

The first hypothetical question the ALJ asked the VE was to assume a person with Sorensen's past work who was able to work at about the light exertional level, picking up twenty pounds on occasion and less than ten frequently; could sit six hours and stand or walk six hours of an eight-hour workday; was limited to only occasional overhead reaching on the left; could frequently climb stairs, balance, crouch, kneel, and stoop; would have to avoid climbing ladders, scaffolds, and ropes due to left arm problems; and could only occasionally crawl. AR 48-49. The individual would also be limited to only occasional handling and fingering on the dominant right hand. AR 49. The individual would have to avoid any concentrated exposure to hazards such as unprotected heights, fast or dangerous machinery, high vibrations, and extreme cold, and the individual would have some mild to moderate chronic pain and discomfort, which would likely be noticeable most of the time. Id. However, with appropriate medications, the individual could be active at these limits. Id. The VE testified that the person would not be able to do any of Sorensen's past work. Id. The VE further noted that he was unable to identify a transferability of skills to light or sedentary work. Id.

The VE said that, given the hypothetical limitations and the restriction to occasional handling and fingering with the dominant right hand, there was a limited range of light work that the hypothetical individual could perform in a

"category of jobs called counter and rental clerks." AR 50. He said there are jobs here like furniture rental clerk, 295.357-018, photo finishing clerk, 249.366-010, or boat rental clerk, 295.467-014. Id.   The VE stated, "If we take all those jobs together, we have over 69,000 jobs in our national economy and have over 900 in the regional economy." Id. He stated those are light and unskilled occupations. Id.

The VE stated that if the person could not stay on task such that they were only performing at 75% of normal capacity during the last one to two hours of the workday, then they were not competitively employable. AR 50.

The VE confirmed that the additional vocational factors of being 49 to 50 years old and having a GED education would not alter his opinions. AR 51.

The ALJ did not ask the VE whether his testimony was consistent with the DOT. AR 48-51.

Sorensen's hearing counsel declined the ALJ's invitation to question the VE. AR 51.

**F.    Other Evidence:**

Mr. Sorensen submitted O*NET data documenting the Counter and Rental Clerks O*NET code 41-2021.00 to the Appeals Council. AR 239. The O*NET report documents the 23 occupations from the DOT which constitute the Counter and Rental Clerks O*NET code. Id.

**G.    Disputed Facts**

The parties interpret differently the manner in which Sorensen completed a few sections of the Function Report, found at AR 193-94.  See Docket 13,

20

¶¶ 62-63.  The court will address its interpretation of these sections of the function report when necessary in discussing the issues presented throughout this opinion.

## DISCUSSION

**A.    Standard of Review.**

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Klug v. Weinberger</u>, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a rubber stamp for the [Commissioner's] decision, and is more than a search for the existence of substantial evidence supporting his decision." <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting  it. <u>Woolf</u>, 3 F.3d at 1213.   The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. <u>Id.</u>   If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed.  <u>Oberst v. Shalala</u>, 2 F.3d 249,

250 (8th Cir. 1993).  "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed.  Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g).  Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis.  Erroneous interpretations of law will be reversed.  Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted).   The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  Smith, 982 F.2d at 311.

**B.    The Disability Determination and the Five Step Procedure.**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.  The ALJ applies a five-step procedure to decide whether an applicant is disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520.  When a determination that an applicant is or is not disabled can be made at any step,

22

evaluation under a subsequent step is unnecessary.  Bartlett v. Heckler, 777

F.2d 1318, 1319 (8th Cir. 1985).  The five steps are as follows:

**Step One:**    Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment or combination of impairments  the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry.  Bartlett 777 F.2d at 1320, n.2.  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work.  Heckler v. Campbell, 461 U.S. 458, 460, (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four.  NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC).  If  the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled.  20 C.F.R. §§ 404.1520(e); 404.1545(e).  If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform.  To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience.  20 C.F.R. § 1520(f).

**C.    Burden of Proof.**

The Plaintiff bears the burden of proof at steps one through four of the five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt,  204 F.3d at 852; 20 C.F.R. § 404.1512(a).  The burden of proof shifts to the Commissioner at step five.  "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting at step five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).

**D.    The Parties' Positions.**

Mr. Sorensen asserts the Commissioner erred by finding him not disabled within the meaning of the Social Security Act.  He asserts the Commissioner erred in four ways:   (1) The Commissioner erred in evaluating the expert physicians' opinions; (2) The Commissioner erred in evaluating Mr. Sorensen's RFC; (3) The Commissioner failed to meet her burden to identify occupations with jobs existing in significant numbers which Mr. Sorensen could perform; and (4) The Commissioner erred in evaluating Mr. Sorensen's credibility.

The Commissioner asserts substantial evidence supports the ALJ's determination that Mr. Sorensen was not disabled during the relevant time frame and the decision should be affirmed.

24

**E.     Analysis.**

>   **1.     The Commissioner's Evaluation of the Expert Medical
>            Evidence.**

The ALJ's discussion of the medical opinion evidence begins on page

eight of his written decision (AR 20).  The ALJ reviewed medical records

received from the orthopedist (Dr. Rothrock); the consultative examiner

(Dr. Kidman), Mr. Sorensen's chiropractor (Dr. Joyce); and the state agency

medical consultants (Dr. Vander Woude and Dr. Entwistle).  These were the

medical providers who were either asked by the Social Security Administration

to provide opinions about Mr. Sorensen's RFC or whose records provided

opinions about Mr. Sorensen's RFC, solicited by the SSA or otherwise.

The ALJ assigned declined to give "controlling or special weight" to

Dr. Rothrock's opinion.  AR 20.  The ALJ instead assigned "limited weight" to

Dr. Rothrock's, opinion and "[did] not give great weight" to the opinion of the

SSA's consultative examiner (Dr. Kidman).  The ALJ likewise "[did] not give

weight" to the opinions offered by the chiropractor (Dr. Joyce) or the treating

physician from the Sioux Falls Community Health Clinic (Dr. Geis).  AR 21.

Instead the ALJ "[gave] weight" to the opinion of the non-treating, non-

examining state agency consultants.  Mr. Sorensen asserts the ALJ erred in

evaluating the expert medical evidence because he argues the ALJ should have

(1) found Dr. Rothrock to be a treating source; and (2) given Dr. Rothrock's

opinion deference.

The ALJ's discussion of the weight he assigned to the medical opinions

appears on page eight of his written decision (AR 20).  The ALJ declined to give

Dr. Rothrock special or controlling weight because (1) Dr. Rothrock did not

have a longitudinal relationship with Mr. Sorensen; (2) Dr. Kidman's earlier

statement in April, 2011 that Mr. Sorensen's right hand strength was 4.5/5

was inconsistent with Dr. Rothrock's opinion that Mr. Sorensen was incapable

of any lifting or range of motion with the right hand; (3) Mr. Sorensen's lack of

longitudinal treatment for his right wrist and his ability to perform activities of

daily living was inconsistent with an inability to lift or perform any range of

motion with the right wrist.

"Generally, a treating physician's opinion is given more weight than other

sources in a disability proceeding." <u>Anderson v. Astrue</u>, 696 F.3d 790, 793

(8th Cir. 2012) (citing 20 C.F.R. § 404.1527(c)).  "Indeed, when the treating

physician's opinion is supported by proper medical testing and is not

inconsistent with other substantial evidence in the record, the ALJ *must* give

the opinion controlling weight . . . However, an ALJ may discount or even

disregard the opinion of a treating physician where other medical assessments

are supported by better or more thorough medical evidence, or where a treating

physician renders inconsistent opinions that undermine the credibility of such

opinions." <u>Id.</u> (citations omitted, punctuation altered, emphasis added).

"Ultimately, the ALJ must 'give good reason' to explain the weight given the

treating physician's opinion." <u>Id.</u> (citing 20 C.F.R. § 404.1527(c)(2)).

Additionally, SSR 96-2p instructs that,

Adjudicators must remember that a finding that a treating source
medical opinion is not well-supported by medically accepted
clinical and diagnostic techniques or is inconsistent with the other
substantial evidence in the case record means only that the

> opinion is not entitled to 'controlling weight,' not that the opinion
> should be rejected.  Treating source medical opinions are still
> entitled to deference and must be weighed using all of the factors
> provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a
> treating source's medical opinion will be entitled to the greatest
> weight and should be adopted, even if it does not meet the test for
> controlling weight.

See SSR 96-2p, POLICY INTERPRETATION, at p. 6.

Conversely, the opinion of a consulting physician who examines a

claimant once or not at all does not generally constitute substantial evidence.

"We have stated many times that the results of a one-time medical evaluation

do not constitute substantial evidence on which the ALJ can permissibly base

his decision."  Cox v. Apfel, 345 F.3d 606, 610 (8th Cir. 2003) (citations

omitted).  "This is especially true when the consultative physician is the only

examining doctor to contradict the treating physician."  Id. Likewise, the

testimony of a vocational expert who responds to a hypothetical based on such

evidence is not substantial evidence upon which to base a denial of benefits.

Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (internal citations omitted).

The factors to consider for assigning weight to medical opinions are set

forth by regulation:

> (c) How we weigh medical opinions.  Regardless of its source, we
> will evaluate every medical opinion we receive.  Unless we give a
> treating source's opinion controlling weight under paragraph (c)(2)
> of this section, we consider all of the following factors in deciding
> the weight we give to any medical opinion.
>     (1) Examining relationship.  Generally, we give more weight
> to the opinion of a source who has examined you than to the
> opinion of a source who has not examined you.
>     (2) Treatment relationship.  **Generally, we give more weight
> to opinions from your treating sources, since these sources are
> likely to be the medical professionals most able to provide a
> detailed, longitudinal picture of your medical impairment(s)**

27

**and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion.**  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) Length of treatment relationship and frequency of examination.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we give the source's opinion more weight that we would give it if it were from a non-treating source.

(ii) Nature and extent of the treatment relationship.  Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. *****.  When the treating source has reasonable knowledge of your impairment(s) we will give the source's opinion more weight than we would give it if it were from a non-treating source.

(3) Support ability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because non-examining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all the pertinent evidence in our claim, including opinions of treating and other examining sources.

(4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors.  When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

<u>See</u> 20 C.F.R. § 404.1527(c) (Emphasis added).

Also relevant to Mr. Sorensen's argument here is 20 C.F.R. § 404.1502. That regulation determines whether a physician's opinion is a "treating source" opinion which is entitled to controlling weight or whether the physician's opinion is a non-treating or non-examining  medical opinion to which the factors outlined in 20 C.F.R. § 404.1527(c) (2)(i) and (c)(2)(ii) , and (c)(3) through (c)(6) should be applied to determine the weight to be it should be assigned.   20 C.F.R. § 404.1502 states in relevant part:

**§ 404.1502  General definitions and terms for this subpart.**

As used in this subpart—

Acceptable medical source refers to one of the sources described in § 404.1513(a) who provides evidence about your impairments.  It includes treating sources, non-treating sources, and non-examining sources.

**

Medical sources refers to acceptable medical sources, or other
health care providers who are not acceptable medical sources.

Non-examining source means a physician, psychologist, or other
acceptable medical source who has not examined you but provides
a medical or other opinion in your case.  At the administrative law
judge hearing and Appeals Council levels of the administrative
review process, it includes State agency medical and psychological
consultants, other program physicians and psychologists, and
medical experts, or psychological experts we consult.  See
§ 1404.1527.

Non-treating source means a physician, psychologist, or other
acceptable medical source who has examined you but does not
have or did not have an ongoing treatment relationship with you.
The term includes a medical source who is a consultative examiner
for us, when the consultative examiner is not your treating source.
See  § 404.1527.

***

 Treating source means your own physician, psychologist, or other
acceptable medical source who provides you, or has provided you,
with medical treatment or evaluation and who has, or has had, an
ongoing treatment relationship with you.  Generally, we will
consider that you have had an ongoing treatment relationship with
an acceptable medical source when the medical evidence
establishes that you see, or have seen, the source with a frequency
consistent with accepted medical practice for the type of treatment
and/or evaluation required for your medical condition(s).  We may
consider an acceptable medical source who has treated or
evaluated you only a few times or only after long intervals (e.g.
twice a year) to be your treating source if the nature and frequency
of the treatment or evaluation is typical for your condition(s).  We
will not consider an acceptable medical source to be your treating
source if your relationship with the source is not based on your
medical need for treatment or evaluation, but solely on your need
to obtain a report in support of your claim for disability.  In such a
case, we will consider the acceptable medical source to be a non-
treating source.

***

See  20 C.F.R. § 404.1502.

30

Mr. Sorensen asserts that though he saw Dr. Rothrock only once, the ALJ erred by failing to treat Dr. Rothrock as a treating source. In the alternative, Mr. Sorensen asserts the ALJ should have given Dr. Rothrock's opinion "deference" as an examining source under the provisions of 20 C.F.R. §§ 404.1502 and 404.1527.  Sorensen cites <u>Shontos v. Barnhart</u>, 328 F.3d 418, 425 (8th Cir. 2003) in support of his position. In that case, the claimant intermittently received mental health treatment from a team of providers. The physician who completed the RFC form was part of the team, but had not recently treated the claimant at the time she completed the form. The Eighth Circuit explained:

> The regulations do not define a treating source as one who is currently treating a claimant at the time they complete the Questionnaire.  However, even if we were to assume that the ALJ's interpretation is correct, Dr. Burn was Ms. Shontos' treating clinical psychologist for two months.  At the very least, Dr. Burn had what the regulations describe as an examining relationship, and accordingly, his opinion would be given more weight than a source who had not examined Ms. Shontos.  20 C.F.R. § 1527(d)(1).

<u>Shontos</u>, 328 F.3d at 425.  Mr. Sorensen also cites <u>DiMasse v. Barnhart</u>, 88 Fed. Appx. 956 (8th Cir. 2004) (unpublished).  In that case, the Eighth Circuit reversed the Commissioner's decision because she failed to afford the claimant's psychiatrist treating source status.  <u>Id.</u> at 957.  Though the claimant did not treat with Dr. Manlove often, she treated with him over a long period of time.  "Dr. Manlove treated DiMasse for three years, seeing her twice in 1997, once in 1998, and seven times in 1999; and his lengthy report showed

31

significant familiarity with her history and condition.  These facts put

Dr. Manlove squarely within the definition of treating source."  <u>Id.</u>

 In neither <u>Shontos</u> nor <u>DiMasse</u>, however, had the physician seen the

claimant only *once* (and then never again) before offering an opinion on the

claimant's functional abilities.  Mr. Sorensen has offered no authority, and the

court has found none, for the proposition that such a medical opinion has been

accepted as a treating source which is entitled to controlling weight pursuant

to 20 C.F.R. § 404.1527(c)(2).  There is substantial amount of authority,

however, indicating that a one-time visit is insufficient to qualify a physician

for treating source status.  In <u>Smith v. Commissioner of Social Security</u>, 482

F.3d 873, 876 (6th Cir. 2007), the Sixth Circuit rejected a Social Security

claimant's assertion that the commissioner erred by failing to give her

physician's opinion controlling weight.  "Martin examined Smith only once . . .

and wrote a single physical capacity evaluation.  Shah examined Smith,

completed a medical report, prescribed and refilled back pain medication, and

denied additional medication when Smith returned seeking more.  We agree . . .

that Smith's contacts with Martin and Shah fail to evince the type of ongoing

treatment relationship contemplated by the plain text of the regulation."

<u>Smith</u>, 482 F.3d at 876.

 The claimant likewise argued her physician's opinion should have been

given controlling weight in <u>Doyal v. Barnhart</u>, 331 F.3d 758, 762-63 (10th Cir.

2003).  In <u>Doyal</u>, the claimant's physician saw her a single time.  The Tenth

Circuit affirmed the ALJ's refusal to afford the physician treating source status

and therefore grant his opinion controlling weight.

> The treating physician's opinion is given particular weight because of his 'unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.' 20 C.F.R. § 416.927(d)(2). This requires a relationship of both duration and frequency. 'The treating physician doctrine is based on the assumption that a medical professional *who has dealt with a claimant and his maladies over a long period of time* will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records.' Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994) (emphasis added). As the Supreme Court recently observed, 'the assumption that the opinions of a treating physician warrant greater credit than the opinions of [other experts] may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration . . .' Black & Decker Disability Plan v. Nord, [538 U.S. 822, 832 (2003)]. Moreover, a longstanding treatment relationship provides some assurance that the opinion has been formed for purposes of treatment and not simply to facilitate the obtaining of benefits.

Doyal, 331 F.3d at 762-63. The Tenth Circuit declined to afford the claimant's

physician treating source status because the claimant had seen the physician

only once during the relevant time period. Id. at 763. See also, Kornecky v.

Commissioner of Social Security, 167 Fed. Appx. 496, 506 (6th Cir. 2006)

(unpublished) (single visit to psychologist did not qualify him as treating

physician whose opinion was entitled to controlling weight);[5] White v. Barnhart,

---

[5] In Kornecky, the court noted the claimant pointed to nothing that prevented her from visiting a single psychiatrist multiple times early enough for that source to qualify as a treating source by the time of her application or by the time of the hearing. Kornecky, 167 Fed. Appx. at *9. The same can be said in this case. Mr. Sorensen explains his failure to return to Dr. Rothrock because he lost Medicaid coverage shortly after his visit with Dr. Rothrock and he was hesitant to undergo the surgical procedure Dr. Rothrock recommended. This is

415 F.3d 654, 658 (7th Cir. 2005) (physician who examined the claimant only once is not a treating source whose opinion is entitled to controlling weight under the regulations).

The claimant's attempt to offer his physician's report as a treating source report was likewise rejected in Evitts v. Commissioner of Social Security, 2012 WL 4470680 at* 7  (E.D. Mich., June 29, 2012).  There, the claimant's physician completed a functional capacity form on the claimant's first visit. The court noted that a "plethora of decisions unanimously hold that a single visit to a physician does not constitute an ongoing treatment relationship. Indeed, depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship." Id. at 7.  The court further explained that even if the physician subsequently developed the requisite treating source relationship, his May 2010 opinion would nevertheless not be entitled to treating source deference. Id.  "The relevant inquiry is not whether the examining doctor might have

---

does not explain why Mr. Sorensen did not seek treatment prior to 2011.  In any case, even if Mr. Sorensen has a legitimate reason for seeing Dr. Rothrock only once, the fact remains that he did see him only once.  The court concludes a single visit cannot render Dr. Rothrock a treating physician.

But Mr. Sorensen asserts his wrist pain has been ongoing and progressive and he attributes it to injuries which are decades old.  There is no explanation in the record for the lack of earlier consistent medical treatment (or any medical treatment, for that matter) for wrist pain between the previous surgical procedures on his right hand in 1990 or 1994 (AR 20, 24, 43) and the date Mr. Sorensen was referred to and saw Dr. Rothrock (October 28, 2011) (AR 261)—nearly a year after his alleged date of onset and only days before he lost his Medicaid coverage.

become a treating doctor in the future if plaintiff had visited him again.  The question is whether the physician had the ongoing relationship with plaintiff to qualify as a treating physician *at the time he rendered his opinion.*"  Id. (citation omitted, punctuation altered, emphasis added).  See also, Luteyn v. Commissioner of Social Security, 528 F. Supp. 2d 739, 743 (W.D. Mich. 2007) (as a matter of law in the Sixth Circuit a physician who has seen the claimant only once cannot be a treating source but may be an examining source, citing cases).

Next, Mr. Sorensen asserts that even if Dr. Rothrock's opinion is not given controlling weight as a treating physician, the ALJ erred by not giving it greater weight or deference.  See Docket 15 at p. 5.  Once it is determined Dr. Rothrock is not a treating physician whose opinion is given controlling weight, his opinions are weighed along with all the other medical opinions using the factors outlined in 20 C.F.R. § 404.1527(c).

In a letter dated October 28, 2011 (AR 261) Dr. Rothrock opined Mr. Sorensen "is not a good candidate for labor type activity . . . and  . . . was encouraged not to do any lifting or range of motion of the right wrist . . ." until he underwent a salvage type procedure and fusion of the right wrist.  Id.[6]  The ALJ cited three reasons for assigning "limited weight" to Dr. Rothrock's

---

[6] Mr. Sorenson criticizes the ALJ for failing to explain how an ability to perform daily activities without significant restrictions is incompatible with an inability to use his hand and wrist *in a sustained work environment.*  See Docket 15, p. 7-8.  Sorensen misstates the limitations as provided by Dr. Rothrock. Dr. Rothrock instructed Mr. Sorensen "not to do ***any*** lifting or range of motion . . ." AR 261.  This restriction is, as noted by the ALJ, clearly inconsistent with Sorensen's admitted activities of daily living.

opinion.  AR 20.  First, he noted that although Dr. Rothrock was a specialist, he did not have a longitudinal treatment relationship with Mr. Sorensen. Second, he noted Mr. Sorensen's previous examination with Dr. Kidman showed almost full strength (4.5/5) in the right hand and wrist which was inconsistent with Dr. Rothrock's indication that Sorensen should avoid all lifting and range of motion.  Id.  While Sorensen correctly notes there are some consistencies between Dr. Rothrock's and Dr. Kidman's examinations,[7] the ALJ correctly noted Dr. Rothrock's extreme limitation of no lifting or range of motion was inconsistent with Dr. Kidman's observation of minimal decreased grip strength.   Third, the ALJ noted that Dr. Rothrock's indication for no lifting or range of motion was inconsistent with Mr. Sorensen's lack of longitudinal treatment for right wrist pain, as well as his ability to perform activities of daily living without significant restrictions.[8]  The ALJ's  conclusions are all legally

---

[7] Both doctors agreed that even with additional surgical intervention on the right wrist, Mr. Sorensen would probably not be capable of continuing in "labor-type" work.  See AR 259 (Dr. Kidman) and AR 261 (Dr. Rothrock).

[8] The ALJ referenced Mr. Sorensen's functional report (AR 193-95) which is not very enlightening.  It does, however, indicate that Sorenson was capable of taking his children to their doctor appointments, cooking meals, and mowing his lawn.  These activities, while not particularly strenuous, are not consistent with Dr. Rothrock's limitation of no lifting or range of motion.  Likewise, though Mr. Sorensen did not check the box that said "check here if no problem with personal care"  he likewise failed to write anything  in any of the lines left for him to explain how his injuries affected his various personal care abilities such as dressing, bathing, shaving, feeding himself, toileting, etc.  Therefore, the court concludes Mr. Sorensen left the entire PERSONAL CARE section of the form blank because his injuries did not affect those abilities.   See AR 193.  This is consistent with the information provided to Dr. Kidman.  See AR 258, "he circles all chores and self-care activities as being able to do those."
Mr. Sorensen also told Dr. Kidman that he played softball and bowled.  AR 258.

sound pursuant to 20 C.F.R. § 404.1527(c) and supported by substantial evidence in the record.  It is therefore not within this court's discretion to reverse them.  <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992);<u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993).

**2.     The Commissioner's Determination of Mr. Sorensen's RFC.**

Mr. Sorensen also asserts the ALJ incorrectly formulated his RFC. Specifically, Mr. Sorensen asserts the ALJ erred because he assigned "minimal" weight to Dr. Kidman's opinion[9] but instead drew his own inferences from Dr. Kidman's report while purporting to adopt the opinions of the non-treating, non-examining state agency physicians.  On this point, the court agrees with Mr. Sorensen.

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations."  <u>Lauer v. Apfel</u>, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).   "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability.  20 C.F.R. § 404.1545(b)." <u>Cooks v. Colvin</u>, 2013 WL 5728547 at *6 (D.S.D. October 22, 2013).  The formulation of the RFC has been described as "probably the most important issue" in a Social Security case.  <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1147 (8th Cir. 1982) <u>abrogation on other grounds recognized in</u> <u>Higgins v. Apfel</u>, 222 F.3d 504 (8th Cir. 2000).

---

[9] Dr. Kidman is the state agency consultative physician who examined Mr. Sorensen and issued a report.  AR 256-60.

When determining the RFC, the ALJ must "consider the combination of the claimant's mental and physical impairments." Lauer, 245 F.3d at 703. Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all the relevant evidence . . . a claimant's residual functional capacity is a medical question." Id. (citations omitted). "Some medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." Id. (citations omitted). Finally, "[t]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (citations omitted, punctuation altered).

The ALJ's determination of Mr. Sorensen's RFC is deficient because it is not supported by medical evidence. The ALJ explained he "did not give great weight" to the opinion of the state agency's examining consultative physician (Dr. Kidman) (AR 20) and purported to adopt the opinions of the non-treating, non-examining state agency physicians (Entwistle and Vander Woude) when he "[gave] weight" (AR 21) to their opinions regarding Sorensen's light exertional level RFC.

Upon close inspection, however, it is clear the ALJ  injected his own inferences into the medical reports to substitute his own limitations for those imposed by the non-treating, non-examining state agency physicians' RFC.  For

38

example, he interpreted Dr. Kidman's "examination findings from range of motion testing" (AR 20) and decided they "support only the occasional use of the right dominant hand for handling and fingering."  AR 21.  Though Dr. Kidman's report indicates he performed range of motion and grip strength testing, he (unlike the non-treating, non-examining state agency physicians) was not asked to and did not comment upon the frequency with which Mr. Sorensen could perform specific work related tasks such as sitting, standing, walking, or manipulative limitations (which would include a specific limitation on the use of his right dominant hand).  See Dr. Kidman's report, AR 256-60.

Sorensen highlights several differences between the state agency non-treating, non-examining  RFC (found at AR 85-89) which the ALJ purportedly adopted and the RFC which the ALJ articulated in his written decision (found at AR 17) and to the vocational expert (VE), and upon which the VE relied in formulating his opinion.  Those differences are listed below:

- The state agency non-treating, non-examining physicians opined Sorensen could perform **frequent** handling and fingering with his right hand (AR 88) but the ALJ's RFC indicated Sorensen was limited to **occasional** handling and fingering with his right hand (AR 17).

- The state agency non-treating, non-examining physicians opined Sorensen had **limited** overhead reaching with his left arm but did not state the frequency (AR 88), but the ALJ's RFC indicated Sorensen was limited to **occasional** overhead reaching with his left arm without explaining which medical opinion he relied upon.  AR 17.

- The state agency non-treating, non-examining physicians opined Sorensen could lift and/or carry **twenty** pounds occasionally (AR 86), but the ALJ's RFC **did not specify** the

amount of weight Sorensen could carry occasionally and limited him to less than 10 pounds frequently (AR 17).[10]

- The state agency non-treating, non-examining physicians opined Sorensen could climb ladders, ropes, and scaffolds **frequently** (AR 87) but the ALJ's RFC indicated Sorensen must **avoid** ladders, ropes and scaffolds **completely** because of his left arm problem (AR 17).

- The state agency non-treating, non-examining physicians opined Sorensen had **no limitation** on balancing , kneeling, crouching and crawling (AR 87), while the ALJ's RFC found Sorensen could only balance, kneel and crouch **frequently** (AR 17) but made **conflicting findings** on crawling, indicating both that Sorensen could do that function both frequently and that he should avoid it altogether due to his left arm problems (AR 17).

- The state agency non-treating, non-examining physicians opined Sorensen had **no environmental limitations** (AR 88) while the ALR's RFC indicated Sorensen must **avoid concentrated exposure to hazards** such as unprotected heights, fast and dangerous machinery, high vibrations, and extreme cold (AR 17).

There is no explanation in the ALJ's decision for the differences between the medical opinion to which he purportedly "gave weight," (the state agency non-treating, non-examining physicians) and the RFC ultimately formulated by the ALJ. The differing restrictions adopted by the ALJ are not articulated by any of the other medical providers in the record. The only conclusion that can be reached is that the ALJ drew his own inferences from either the records of the other medical providers or from the records of the experts whose opinions he purported to adopt, and then inserted them into the RFC. This practice is

---

[10] In his oral recitation of the RFC to the VE, the ALJ indicated Mr. Sorensen could "pick up 20 pounds on occasion." AR 48.

"forbidden by law." Pate-Fires v. Astrue, 564 F.3d 935, 947 (8th Cir. 2009) (citations omitted).

First, the Eighth Circuit has explained that reliance on the opinion of a non-examining, non-treating physician to determine RFC does not normally constitute substantial evidence on the record. "The ALJ relied on the opinions of non-treating, non-examining physicians who reviewed the reports of the treating physicians to form an opinion of [claimant's] RFC. In our opinion, this does not satisfy the ALJ's duty to fully and fairly develop the record. The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). Further, when there is no medical evidence in the record the ALJ "cannot simply make something up." Everson v. Colvin, 2013 WL 5175916 at * 20 (D.S.D., Sept. 13, 2013). "[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000). The ALJ  must not "succumb to the temptation to play doctor and make their own independent medical findings." Pate-Fires , 564 F.3d at 947 (citations omitted). An ALJ also "may not draw upon his own inferences from medical reports." Lund v. Weinberger, 520 F.2d 782, 785 (8th Cir. 1975).

As in Everson, the ALJ's RFC is not supported by substantial evidence for two reasons:  (1) the "light duty" RFC which was adopted by the ALJ was assigned solely by the non-treating, non-examining physician; and (2) the ALJ

compounded the error by adding modifications which were not supported by any record medical evidence whatsoever to the light duty RFC.

Because there is insufficient evidence in the record to determine how Mr. Sorensen's medical impairments affect his ability to function in the workplace, the ALJ should seek such an opinion from either Mr. Sorensen's treating or consulting[11] physicians on remand.  Nevland, 204 F.3d at 858. Reversal and remand is necessary for this purpose.

### 3.    The Commissioner's Identification of Jobs Within Sorensen's Physical Capabilities At Step Five.

At step five of the sequential process, the ALJ must determine whether any substantial gainful activity exists in the national economy which the applicant can perform.  To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience.  20 C.F.R. § 1520(f).  The burden of proof shifts to the Commissioner at step five. "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices."  Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting at step five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act."  Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).

Mr. Sorensen asserts the Commissioner did not meet his burden to identify jobs within Sorensen's RFC at step five.  Mr. Sorensen bases this argument upon the VE's hearing testimony, which begins at AR 48.  Though

---

[11] The state agency examining consultative physician is referred to in 20 C.F.R. § 404.1502 as a non-treating (as opposed to a non-examining) source.

the VE's testimony is not a model of clarity, the court does not agree with Mr. Sorensen's interpretation.

First, the VE agreed that according to the hypothetical presented by the ALJ, Mr. Sorensen was not capable of performing his past relevant work, which was all medium to heavy type work.  AR 49.  Next, he indicated there were a "limited number of light work" jobs that were compatible with the restriction presented dealing with only occasional handling and fingering with the right dominant hand.  AR 50.  Then, the VE referred to a "category of jobs called counter and rental clerks."  Id.  Mr. Sorensen interprets the VE's testimony to mean that, because he referenced the "category of jobs called counter and rental clerks" that the remainder of the information he provided during the hearing pertained to the entire category rather than the specific jobs within the category that he went on to describe.  Taking the VE's testimony as a whole and in context, the court disagrees with Mr. Sorensen's interpretation.  The VE's testimony is quoted below:

> A:   Well there's a limited range of light work that fits within the Hypothetical when we restrict the occasional handling and fingering on the right dominant hand.  A category of jobs called counter and rental clerks; there are jobs here like a furniture rental clerk; 295.357-018.  There's a person who would be a photo-finishing clerk; 249.366-010.  Or you might be a boat rental clerk; 295-467-014.  If we take all those jobs together, we have over 69,000 jobs in our national economy and we have over 900 in the regional economy.  The region I use is a five-state region—North Dakota, South Dakota, Minnesota, Iowa and Nebraska.  Those are light and unskilled occupations.

AR at 50.

43

Though the VE began by describing an entire category of jobs, he also acknowledged at the beginning of his testimony that there was a limited range of work that would accommodate the restricted use of the right dominant hand. He narrowed his discussion to a sub-group within the category when he described three specific jobs (furniture rental clerk, boat rental clerk and photo-finishing clerk) and described how many openings there were for "all those jobs together" (still describing the narrower sub-group):  69,000 jobs in the national economy and 900 jobs in the regional economy and "[t]hose are light and unskilled occupations."  AR 50.

Though this court disagrees with Mr. Sorensen's interpretation of the VE's testimony, an appellate court may have a different view.  The RFC may change on remand.  The Commissioner is therefore encouraged to take the opportunity to further clarify the vocational information to prevent future confusion.

### 4.    The Commissioner's Credibility Determination.

The ALJ found that Mr. Sorensen's medically determinable impairments could cause his alleged symptoms, but that Mr. Sorensen's statements regarding the intensity, persistence, and limiting effects of his symptoms were not fully credible.  AR 18.  Mr. Sorensen's final assignment of error is that the ALJ did not properly evaluate his credibility.

This analysis must begin with the principle that the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence."  Guilliams v.

44

Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).  "When an ALJ reviews a claimant's subjective allegations of pain and determines whether the claimant and his testimony are credible, the ALJ must examine the factors listed in Polaski and apply those factors to the individual."  Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996).  See also Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3).  In this case, the ALJ's credibility analysis begins on page six of his written decision (AR 18).  It applies some of the Polaski factors and explains how they apply to Mr. Sorensen.  AR 18-20.  The ALJ is not required to "explicitly discuss *each* Polaski factor in a methodical fashion" but rather it is sufficient if he "acknowledge[s] and consider[s] those factors before discounting [the claimant's] subjective complaints of pain."  Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996) (emphasis added).

The appropriate factors to be considered when evaluating whether a claimant's subjective complaints are consistent with the evidence as a whole are: (1) the objective medical evidence; (2) the claimant's daily activities; (3) the duration, frequency and intensity of pain; (3) dosage and effectiveness of medication; (4) precipitating and aggravating factors; (5) functional restrictions; (6) the claimant's prior work history; (7) observations by third parties; (8) diagnosis by treating and examining physicians; and (9) claimant's complaints to treating physicians.  See Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001); Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993).

The ALJ did not explicitly cite <u>Polaski</u> but did cite 20 C.F.R. § 404.1529. AR 17. Mr. Sorensen's primary criticism of the ALJ's credibility analysis is that it uses "boilerplate" language which states that his allegations are "not credible to the extent they are inconsistent with the above residual functional capacity assessment." Mr. Sorensen also asserts the phrasing indicates the ALJ evaluated his credibility in terms of the consistency of his allegations with the RFC the ALJ had already determined, which is not proper. <u>See</u> Docket 15 at p. 20. That characterization, however, does not give the ALJ's written decision a fair reading.

If the "boilerplate" language cited by Mr. Sorensen and the somewhat confusing order in which the RFC and credibility determination are found in the opinion stood alone, the court might be more receptive to Mr. Sorensen's arguments. But "a deficiency in opinion writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case." <u>Senne v. Apfel</u>, 198 F.3d 1065, 1067 (8th Cir. 1999) (citation omitted). Here, the ALJ announced his intent to evaluate Mr. Sorensen's credibility using the entire case record and the factors outlined in 20 C.F.R. § 404.1529 and other applicable regulations. <u>See</u> AR 17. The ALJ then recited Mr. Sorensen's allegations regarding his symptoms and abilities, followed by several of the factors considered by the ALJ to determine that he did not find Mr. Sorensen's allegations completely credible. The factors explicitly discussed by the ALJ were: (1) the objective medical evidence and Mr. Sorensen's sparse medical treatment for the conditions upon which he

based his disability claim (AR 18); (2) Mr. Sorensen's activities of daily living (AR 19);  and (3) Mr. Sorensen's work history, which included many years preceding his alleged date of onset for which there was no explanation why he did not earn income at a level equaling substantial gainful activity.[12]  The ALJ's credibility finding was "supported by good reasons and substantial evidence." Guilliams , 393 F.3d at 801.  As such, the court must defer to the ALJ's credibility determination in this instance.

**F.    Type of Remand.**

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record.  Mr. Sorensen requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider his case.

42 U.S.C. §  405(g) governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).   A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in

---

[12] See Ramirez v. Barnhart, 292 F.3d 576, 581-82 (8th Cir. 2002) (ALJ's credibility determination was not erroneous when it included consideration that claimant was not motivated to work because she had a poor prior work record).

47

accordance with such ruling.  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings.  Id.  Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding."  Buckner, 213 F.3d at 1011.  In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings.  Id., Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated.  See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability).  Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION and RECOMMENDATION

Based on the foregoing law, administrative record, and analysis, this court respectfully RECOMMENDS to the District Court that Mr. Sorensen's Motion to  Reverse and Remand (Docket 14) be GRANTED and that the

Commissioner's decision be REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

## **NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 23rd day of June, 2015.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge